LAURA E. DUFFY
United States Attorney
AARON B. CLARK
California State Bar No. 239764
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-6758

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No. 10cr3986-BTM |
|---|---|---|
| Plaintiff, | ) ) | **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 29, MOTION FOR A NEW TRIAL** |
| v. | ) ) ) |  |
| OSCAR OSBALDO ORTIZ-MARTINEZ, | ) ) |  |
| Defendant. | ) ) ) ) | DATE: November 2, 2012<br>TIME: 2:00 p.m.<br>JUDGE: Honorable Barry Ted Moskowitz<br>COURTROOM 15 |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Laura E. Duffy, United States Attorney, and Aaron B. Clark, Assistant U.S. Attorney, and hereby files its Response in Opposition to Defendant's Motion for New Trial. This Response in Opposition is based on the file and records of this case, the attached Memorandum of Points and Authorities, and any arguments set forth at the hearing on this motion.

**I**

**INTRODUCTION**

Defendant Oscar Osbaldo Ortiz-Martinez ("Defendant" or "Ortiz") apparently asks for a judgment of acquittal, or alternatively, a new trial, on the basis that co-defendant Victor Silva's testimony "was allowed into evidence in error" and there was no evidence of Defendant's knowledge

1  of the object of the conspiracy. Def. Mot. at 2-3.[1/] He is wrong on both counts. Silva competently
2  testified as a percipient witness of relevant facts in the case, and as an admitted co-conspirator with
3  Defendant. And the evidence of Defendant's participation in, and knowledge of, the conspiracy to
4  distribute controlled substances was overwhelming – extending far beyond the testimony of co-
5  defendant Victor Silva.

## II

## STATEMENT OF CASE

### A.     Evidence at Trial

Over the course of the seven day trial, the United States called eleven witnesses to prove that Defendant conspired with Victor Silva to distribute controlled substances, and that Defendant took (and agreed to take) bribes to waive through his assigned inspection lanes what he thought were narcotics-laden vehicles. The evidence and testimony of several of those witnesses bear on Defendant's claims here.

### HSI Special Agent Arturo Curiel

Agent Curiel testified that he acted as an undercover agent for an October 16, 2009 meeting between the confidential informant (CS-1), Silva, and eventually Defendant. Curiel authenticated the recordings and transcriptions/translations from October 16, 2009 and explained that he was posing as a high level narcotics trafficker that day. Along those lines, he negotiated with Silva (who purported to be the middle man negotiating on behalf of Defendant) regarding the type and quantity of the narcotics he would be able to cross through Defendant's lane, as well as the price for such crossings. Curiel testified that he wanted to start small: no more than 10 kgs. of cocaine for the first load. But Silva wanted Curiel to send a full trunk load. They eventually agreed that Defendant would allow in 30 kgs of cocaine on the first load, and Curiel would pay $4,000 a kilogram.

During a second recorded meeting that day, Curiel testified that he was introduced to Defendant, who was sitting in his red Corvette (and wearing a CBP shirt). Curiel shook hands with Defendant,

---

[1/]     Defendant apparently does not take issue with the jury's guilty verdict on the bribery charge.

placed a $2,000 bribe on the passenger seat of the vehicle and asked him, "We're in it, right?" Defendant responded, "Why not?," and then told Curiel to deal with Silva.

**CS-1**

CS-1 testified that he met Silva in the summer of 2009 when CS-1 moved into the same apartment complex. Silva installed Direct TV and asked if CS-1 "needed drivers" to cross narcotics (or people) into the United States. Eventually, Silva told CS-1 that he knew of an inspector that would be willing to allow narcotics into the United States for a fee. CS-1 thereafter began recording his meetings with Silva and took the jury through the following time line:

- October 6, 2009: CS-1 met with Silva and Silva provided the inspector's name – Ortiz. CS-1 also claimed he would move 5 kilograms of heroin through Ortiz's lane if he had the chance. Silva agreed.

- October 9, 2009: Silva introduced CS-1 to Ortiz at an Autozone parking lot in El Centro. During the meeting, Silva told Ortiz that CS-1 would be "the one driving."

- October 16, 2009: CS-1 met with Silva and Curiel and mostly observed the negotiations between the two. He also observed Curiel meet with Ortiz later in the day and specifically saw Curiel pay Ortiz the $2,000 bribe.

- March 12, 2010: CS-1 met with Silva and Ortiz and discussed smuggling kilograms of cocaine through Ortiz's lane. Ortiz expressed concern over a possible computer referral sending CS-1's vehicle to secondary inspection, so they (CS-1, Silva, and Ortiz) came up with the code "Have you been eating tacos in Mexicali?" That code meant that CS-1 should abandon the vehicle and run back to Mexico.

- April 14, 2010: CS-1 met with Ortiz and further discussed smuggling "6, 7, 12" kilograms of cocaine through Ortiz's lane, and that he would pay Ortiz $20,000.

- May 25, 2010: CS-1 met with Ortiz again. They reviewed the code words "Have you been eating tacos in Mexicali?" and CS-1 asked if he could bring "5, 6, or 7 kilograms of cocaine" through Ortiz's lane. Ortiz promised not to send CS-1 to secondary. Ortiz also told CS-1 to purchase a fake id in Mexicali, so the two would not be associated with each other in the TECS system.

• June 3, 2010: CS-1 crossed through Ortiz's lane. Ortiz did not refer him to secondary.

• June 4, 2010: CS-1 met with agents, was provided a paper bag with $20,000, then drove ½ a block to meet with Ortiz. Ortiz got into CS-1's car (the same car Ortiz had waved through the day before), and CS-1 explained that he had crossed 8 kilograms of cocaine. He also gave the bag with $20,000 to Ortiz.

• June 19, 2010: CS-1 met with Ortiz, and Ortiz wanted to have CS-1 start using motorcycles to smuggle narcotics. Ortiz explained that motorcycles would be easier because the plate reader would not catch them, and CS-1 could easily switch lanes if Ortiz had to make a sudden lane shift. Ortiz noted that they could cross narcotics "everyday" if CS-1 used a motorcycle.

• September 14, 2010: CS-1 met with Ortiz and proposed crossing 15 kilograms of methamphetamine through Ortiz's lane for $30,000. Ortiz still wanted CS-1 to use a motorcycle and opined that the 15 kilograms could still fit in a backpack. Ultimately, though, Ortiz relented and said that CS-1 could use his truck the cross the drugs: "if you want to do it, well, go for it."

• September 21, 2010: CS-1 crossed through Ortiz's lane. During the encounter, Ortiz asked "Are you sure it's not a trap?" Ortiz then waved CS-1 through without sending him to secondary.

• September 22, 2010: CS-1 met with Ortiz and explained that he had crossed 15 kilograms of methamphetamine through Ortiz's lane. Ortiz responded, "Just 15?" CS-1 then told Ortiz he would bring payment in a few days.

• September 23, 2010: CS-1 received $30,000 in cash from ICE OPR, then met with Ortiz at the Lucky's parking lot in El Centro. After he got into Ortiz's car, he gave Ortiz the money, and the two of them started to drive to Ortiz's house. At that time, agents arrested them both.

**HSI Special Agent Marlon Mungia**

Special Agent Mungia testified that on October 9, 2009, he was doing surveillance at the Autozone parking lot in El Centro. During his surveillance, he observed Ortiz meet with Silva and CS-1. He also saw Ortiz's Corvette, which he later followed to Ortiz's house.

Mungia also testified that on June 4, 2010, Mungia witnessed agents place a large sum of cash in a paper bag at the ICE OPR office. He later conducted surveillance and took video footage of Ortiz

1  leaving CS-1's vehicle and carrying a paper bag in his hand.  Mungia recognized the paper bag as the
2  same that agents had put the cash in earlier that day.  That video footage was presented at trial.

### CBP Supervisory Officer Gabe Guilin

Officer Guilin testified about the TECS system and authenticated the records reflecting Ortiz's TECS access, and CS-1's June 3, 2010 and September 21, 2010 crossings (using a false id) through Ortiz's lane.  Guilin also authenticated a document reflecting Ortiz's "Oath of Office" upon entering his employment on January 20, 2009.

### Victor Silva

Victor Silva testified that he is the co-defendant in the case, and that he pled guilty to conspiracy to import controlled substances.  The person he conspired with was Ortiz.

Silva testified that he has known Ortiz since high school, and that the two worked together as security guards at the ICE Processing Center in El Centro from 2003-04.  Ortiz also got his hair cut for years by Silva's brother, and he and Ortiz met frequently during those haircuts.

Silva stated that in the summer of 2009, he met CS-1 when CS-1 moved into the same apartment complex.  Silva was financially desperate at the time, and he got the sense that CS-1 was involved in something illegal.  So he approached CS-1 asking if CS-1 needed drivers.  Silva even provided the name of a potential driver.

Silva also knew, based on his conversations with Ortiz at his brother's barber shop, that Ortiz was financially desperate.  So he told CS-1 that he knew of an inspector who would be willing to wave through loads of narcotics.  Silva described a chance meeting with Ortiz at a Circle K in Calexico, wherein Ortiz had told Silva that his (Ortiz's) gun had been taken away at work, and he had been placed on administrative leave.  Silva responded that he knew someone who worked for internal affairs that may be able to help.  And Silva stated that he wanted "a favor for a favor":  Silva would make the introduction to the internal affairs officer, and in exchange, Ortiz would agree to allow narcotics through his lane once he was back on the line.  Ortiz agreed.

Silva then stated that a short while later, in September 2009, Ortiz met with Silva in the back yard of his father's house.  Ortiz was still waiting for Silva to arrange the meeting with the internal

affairs officer. Silva and Ortiz then discussed the particulars of their drug smuggling arrangement, with Silva claiming that Ortiz only wanted to do it "1, 2, or 3 times." For these few trips, though, they wanted to make as much money as possible. Silva claimed he promised Ortiz $75,000 for the first load, which made Ortiz smile. They also specifically discussed smuggling cocaine and methamphetamine. And Ortiz told Silva that he only wanted to work through Silva. The meeting lasted approximately an hour and a half.

The next day, Silva introduced Ortiz to the man Silva knew from internal affairs. Ortiz explained his situation, and the man said there was little he could do. Afterward, Ortiz and Silva further discussed smuggling narcotics once Ortiz was taken off administrative leave.

Silva then gave further context to the October 9, 2009 meeting at the Autozone parking lot, noting that he had told Ortiz that Ortiz would be getting some money at the meeting. Silva also explained that, prior to the October 16, 2009, meeting with CS-1 and Curiel, he told Ortiz he was meeting with the "big boss" to get Ortiz some advance money. Furthermore, the $2,000 bribe paid to Ortiz was supposed to be split between Ortiz and Silva, but Silva claims Ortiz never gave him any of it. In fact, Ortiz never shared any of the bribes with him.

Silva then testified that after he was arrested, he and Ortiz were housed together at the Imperial County Jail, where Ortiz repeatedly apologized for not sharing any of the bribe money with him. Silva also testified that they were also housed close to each other at the GEO facility in San Diego for a few months. During that time, Ortiz apologized "every day" for not sharing the bribe money. Silva also claimed that Ortiz asked him to lie about the October 16, 2009, $2,000 bribe: Ortiz wanted Silva to claim that they had returned the bribe money to CS-1 the next day. Silva also claimed that Ortiz admitted he had used the bribe money on his girlfriend, Marissa Madrigal.

**Sergeant John Dougan**

Imperial County Jail Sergeant John Dougan testified that he is a watch commander at the Imperial County Jail (ICJ). He authenticated documents relating to the housing of Silva and Ortiz while at ICJ and testified that the two were housed together for approximately 6 weeks.

The defense thereafter stipulated that Ortiz and Silva were housed within 6 feet of each other for approximately 2 months, in San Diego, and that they were close enough to each other to be able to communicate daily.

### OIG Special Agent Izabel Figueroa

Agent Figueroa then testified, authenticating the voices on the audio recordings and transcripts. She also testified that it was a violation of a CBP officer's official duties to knowingly wave through a load of narcotics.

Figueroa further testified that she secured half of the $2,000 bribe and half of the $20,000 bribe. She also secured the false passport for CS-1 to use for his crossings through Ortiz's lane, and she observed both the June 3, 2010 and the September 21, 2010 crossings. She also observed ICE OPR secure $30,000 cash in payment for the September 21, 2010 crossing, and she arrested Ortiz.

### Marissa Madrigal

After the Government rested, Marissa Madrigal, Ortiz's former girlfriend, testified for the defense that she had lived with Ortiz during some portion of the relevant time period of the conspiracy and that she knows Ortiz to be honest and law-abiding. She claimed, however, that she never saw Ortiz with large amounts of cash, and that he never spent large amounts of cash on her. Madrigal also authenticated photographs of Ortiz's Corvette.

**B.    Jury Verdict**

Following closing arguments, the jury returned a guilty verdict on both counts in less than four hours. As to the conspiracy count, the jury found Ortiz had conspired to import at least mandatory minimum amounts of cocaine, heroin, and methamphetamine.

### III

### MEMORANDUM OF POINTS AND AUTHORITIES

**A.    Defendant's Motion for Acquittal Should Be Denied**

Defendant first moves for an acquittal under Fed. R. Crim. Proc. 29(c), claiming the evidence was insufficient to support Ortiz's conviction on the conspiracy count. The motion should be denied for several reasons.

First, the motion is untimely. Rule 29(c) specifically requires such motions to be filed within 14 days after a guilty verdict. Defendant's motion was filed approximately one month after the guilty verdict, and he has not demonstrated "excusable neglect" for the delay. Fed. R. Crim. Pro. 45(b).

Second, the Court has already entertained and denied the same motion (albeit pursuant to Rule 29(a)) following the Government's case in chief. Since the Court's original ruling, the only additional evidence received is the testimony of Marissa Madrigal, who testified that (1) she lived with Ortiz off an on during the time period of the conspiracy, (2) she knows Ortiz to be honest and law-abiding, despite having previously made a complaint to police that he had broken the law, (3) she had never seen Ortiz with large amounts of cash, and he had never spent large amounts of cash on her, and (4) she identified photographs of Ortiz's Corvette. None of this additional evidence, particularly when viewed in the light most favorable to the Government, upsets the Court's determination that there was insufficient evidence to sustain a conviction as to both counts against Ortiz.

Third, even if Court had not already denied a motion for an acquittal under Rule 29, it should deny the motion now. As Ortiz concedes, to prevail on his motion he must demonstrate that, viewing the evidence in the light most favorable to the Government, no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Pacheco-Medina, 212 F.3d 1162, 1166 (9th Cir. 2000).

Here, the evidence against Ortiz regarding his participation in a conspiracy with Silva to import narcotics remains overwhelming. As noted above, this evidence includes:

(1) audio recordings and eye witness testimony of an October 9, 2009 meeting between Silva, Ortiz, and CS-1 at an Autozone parking lot in El Centro;

(2) audio recordings and eye witness testimony of Ortiz taking a $2,000 bribe (and, after taking the bribe, telling Agent Curiel to "get with" Silva);

(3) a March 12, 2010 audio recording of Silva, Ortiz, and CS-1 scheming on how best to coordinate crossing narcotics through Ortiz's inspection lanes;

    (4)    audio recordings from April 14, May 25, June 4, June 19, September 14, and September 22, 2010 of detailed conversations between Ortiz and CS-1 regarding the importation of cocaine, heroin, and methamphetamine;

    (5)    video and audio recordings and TECS records of CS-1's June 3 and September 21, 2010 crossings through Ortiz's inspection lanes;

    (6)    audio and video recordings from June 4, 2010 of Ortiz taking a $20,000 bribe (payment for purportedly waiving through a load vehicle); and

    (7)    testimony from Silva, Ortiz's admitted co-conspirator, about Ortiz's involvement in the conspiracy.

In short, there can be no question but that the jury could have rationally found (and did find) beyond a reasonable doubt that Ortiz knowingly entered into a conspiracy to import narcotics. The Court should therefore deny Defendant's motion under Rule 29(c).

### B.   Defendant's Motion for a New Trial Should be Denied

Defendant also moves for a new trial, apparently claiming that Silva was improperly allowed to testify, as well as renewing the claim that the Government failed to provide evidence of narcotics importation conspiracy with Silva. He again errs on both claims.

Rule 33(a) of the Federal Rules of Criminal Procedure reads in pertinent part, " Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Although a motion for a new trial is left to the discretion of the district court, it should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict. United States v. Pimentel, 654 F.2d 538, 545 (9th Cir. 1981).

Here, as set forth above, the claim that the Government failed to adduce sufficient evidence of Ortiz's conspiracy with Silva simply ignores the mountain of evidence to the contrary – even without considering Silva's testimony.

And as to the claim that Silva's testimony was "allowed into evidence in error," Defendant is decidedly mistaken. Silva testified to events of which he had personal knowledge, as specifically permitted under Fed. R. of Evidence 602. As statements from Ortiz that Silva testified to hearing, such

statements are also explicitly permitted as non-hearsay statements of an opposing party under Fed. R. of Evidence 801(d)(2). This motion is therefore without merit and should be denied.

## IV
## **CONCLUSION**

For the reasons set forth above, Defendant's motions should be denied.

DATE: October 26, 2012               Respectfully submitted,

                                                         LAURA E. DUFFY
                                                         United States Attorney

                                                         /s/ Aaron B. Clark
                                                         AARON B. CLARK
                                                         Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>OSCAR OSBALDO ORTIZ-MARTINEZ,<br><br>Defendant. | Case No.   10cr3986-BTM<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED THAT:

I, Aaron B. Clark, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL** on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them:

1.   Jorge Jaramillo

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 26, 2012.

s/ Aaron Clark
AARON B. CLARK